10549-R0923
G:\23\R0923\R0923PAN 003
TKH:jeg

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| HENRY KOESTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No.: 06-3124 |
| | ) |
| AMERGEN ENERGY COMPANY, LLC | ) |
| and EXELON CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, AMERGEN ENERGY COMPANY, LLC, and EXELON CORPORATION, by JAMES C. KEARNS and TAMARA K. HACKMANN, of Heyl, Royster, Voelker & Allen P.C., and RALPH H. JOHNSON, of Blank Rome LLP, their attorneys, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(D), and for their Reply to Plaintiff's Response To Defendants' Motion for Summary Judgment, state as follows:

**REPSONSE TO PLAINTIFF'S "ADDITIONAL FACTS"**

Pursuant to Local Rule 7.1(D)(2)(b), the Plaintiff's response should include a subsection including "Additional Material Facts". Plaintiff has included within his motion a section entitled "Addendum to Statement of Material Undisputed Facts", which Defendants presume are his purported "Additional Materials Facts".

**A.    Defendants' Response To Additional Facts 1-15.**

**Plaintiff's Additional Fact #1.**  A locked high radiation area is an area where a person could receive in excess of the thousand millirem in one hour and that would be posted as a locked high radiation area as required by law.

1

**Defendants' Response**: Immaterial. Defendants admit an area posted as a locked high radiation area is an area where radiation dose rates *could* exceed one thousand millirems per hour. Defendants further state that Additional Fact #1 is immaterial because, as Plaintiff admits, information regarding the radiation *dose rate* in an area, by itself, cannot establish a person's dose. See Defendants' SOF 8 and Plaintiff's Response thereto, wherein Plaintiff admits that "the fact Plaintiff received a dose rate at some point in time does not tell anything about his actual dose." Using dose rate information to determine dose to an individual requires expert interpretation of this information, as well as other evidence. Id.

**Plaintiff's Additional Fact #2.** A locked high radiation area is identified by placement of a rope as a barrier. This acts as a communication to the workers and a red flashing light to augment the area.

**Defendants' Response**: Immaterial. Defendants agree that a rope signifies, among other things, that dose rates from a component located within the roped area *could* exceed 1,000 millirem per hour. See Pl. Exhibit 1, Vicker's deposition, page 123. In such cases, the rope barrier is typically placed some distance slightly further out from the component, and includes areas where the dose rate is less than 1,000 millirem per hour. Id at page 55, 123. Defendants further state that Additional Fact #2 is immaterial because information regarding the radiation *dose rate* in an area, by itself, cannot establish a person's dose, and Plaintiff has presented no expert evidence supporting a dose based on this dose rate information.

**Plaintiff's Additional Fact #3**. Glen Vickers did not have the opportunity to speak with the person that generated the survey sheets.

**Defendants' Response**: Immaterial. Mr. Vickers was not deposed pursuant to Fed. R. Civ. P. 30(b)(6) and there was no requirement that he talk with the person that generated the survey sheet. Defendants further state that Additional Fact #3 is immaterial because the values reported on the survey sheets were dose rate readings and Plaintiff has presented no expert evidence supporting a dose based on this dose rate information.

**Plaintiff's Additional Fact #4**. When there is leakage in the steam tunnel there would be beta and gamma emitting from the pipes. Radiation levels may change depending on where the

2

technician took the measurement. If the technician stood one foot closer versus one person one feet away, they may be different.

**Defendants' Response**. Immaterial. Plaintiff has presented no competent evidence that there was leakage in the steam tunnel. Mr. Vickers testified that dose rate "measurements may differ, depending on where the technician took the measurement. If the tech stood one foot closer versus one person one foot away, they may be different." Defendants further state that Additional Fact #4 is immaterial because information regarding the radiation *dose rate* in an area, by itself, cannot establish a person's dose, and Plaintiff has presented no expert evidence supporting a dose based on this dose rate information.

**Plaintiff's Additional Fact #5.** Vickers agrees that a locked high radiation area is defined as an area where one can receive greater than a 1,000 millirem per hour. That the access is locked due to high dose rates.

**Defendants' Response**. Immaterial. Defendants admit an area posted as a locked high radiation area is an area where radiation dose rates *could* exceed one thousand millirems per hour. Defendants further state that Additional Fact #5 is immaterial because, as Plaintiff admits, information regarding the radiation *dose rate* in an area, by itself, cannot establish a person's dose. See Defendants' SOF 8 and Plaintiff's Response thereto, wherein Plaintiff admits that "the fact Plaintiff received a dose rate at some point in time does not tell anything about his actual dose." Using dose rate information to determine dose to an individual requires expert interpretation of this information, as well as other evidence. Id.

**Plaintiff's Additional Fact #6.** Based on the survey sheets, Vickers agrees that LHRA is defined as a locked high radiation area.

**Defendants' Response**: Immaterial. Defendants state Additional Fact #6 is immaterial because Plaintiff has no expert testimony on dose.

**Plaintiff's Additional Fact #7.** Mr. Koester worked in the steam tunnel in areas designated as locked high radiation on February 10, 2004.

**Defendants' Response**: Immaterial, Unsupported, and Disputed. Plaintiff's affidavit does not support his alleged fact. Plaintiff testified that (1) he worked within twelve inches of a

3

locked high radiation area, (2) that his feet were standing in a *high radiation area*, and (3) that he "was working in an area that *should have been* designated as a locked high radiation area." See Pl. Exhibit 3, ¶ 6, 7, 9.  There is no competent evidence that Plaintiff worked in an area that was designated as a locked high radiation area. Plaintiff has, moreover, testified via his affidavit that the area in which he was working was designated as a "high radiation area", which is defined by Defendants' training manual as an area with a dose rate greater than 100 millirem per hour and less than 1,000 millirem per hour at 30 cm from the source of radiation.  See Pl. Exhibit 1, Vickers Deposition 87 and Bates 301 which was marked as Exhibit 8 to Vickers' Deposition and which is attached hereto as Defendants' Exhibit 5.  Plaintiff's affidavit provides no competent evidence of his dose on February 10, 2004. Defendants further state that Additional Fact #7 is immaterial because Plaintiff's presence within a high radiation area and proximity to a locked high radiation area, by itself, fails to establish his dose while working in the area, and Plaintiff has presented no expert evidence supporting a dose based on this dose rate information.

**Plaintiff's Additional Fact #8.** The survey sheets attached to Vickers' deposition including Exhibit 2 and 3 indicate Mr. Koester was working on a valve which was in close proximity if not inside a locked radiation area.

**Defendants' Response**:  Immaterial and Incompetent.  Plaintiff has testified in his affidavit that he was working in an area marked as a "high radiation area", and not a "locked high radiation area".  See Pl. Exhibit 3, ¶ 6-7.  Vickers testified that one could not tell by looking at the survey whether the valve that Plaintiff was working on was inside a locked high radiation area.  See Pl. Exhibit 1, page 51, line 9-10.  Defendants further state that Additional Fact #8 is immaterial because Plaintiff has no expert testimony on dose.

**Plaintiff's Additional Fact #9**.  Dr. Stephen Banks issued a report which is attached to his deposition as Exhibit 5 in which he opines that "The facts of the record show that Mr. Koester was exposed to a significant dose of radiation on 2/10/04 such that his dose alarm did register a higher than acceptable exposure at the chest level. The record also shows that this exposure was received in an area classified as high exposure risk to exceed 1,000 millirem per hour. Following this exposure, Mr. Koester has developed neuropathy symptoms involving this

feet which he believes to have arisen from his exposure. These symptoms have had a dramatic deleterious impact on his life. Peripheral neuropathies such as those he has described can certainly arise from radiation exposure in doses which are in excess of 1,000 millirem per hour."

   **Defendants' Response**: Immaterial, Unsupported, and Disputed. While it is true that Dr. Banks issued the report identified as Plaintiff's Exhibit 4, it is also true that Dr. Banks subsequently admitted during his deposition that the statements made in his report were inaccurate, insignificant, and immaterial to dose and causation. For example, Dr. Banks testified that when he said "the facts of the record show that Ms. Koester was exposed to a significant dose of radiation on 2/10/04," he meant only that the dose was measurable on a dosimeter. He did not mean to communicate any judgment as to health effects or health consequences of the dose. See Def. Exhibit 3, pages 138-140. Dr. Banks further testified that he made a mistake in saying that Plaintiff's "dose alarm did register a higher than acceptable exposure at the chest level." He meant to say "dose rate alarm" rather than "dose alarm." Id. at 140. Dr. Banks further testified that the fact Plaintiff received a dose rate would not tell us anything about the Plaintiff's dose. Id. at 144.

   Dr. Banks statement that Plaintiff's "exposure was received in an area classified as high exposure risk possibly to exceed 1,000 millirem per hour" was based upon Attorney Schiro's conclusory statement that Plaintiff was working in such area. See Def. Exhibit 3, pages 100-103. Dr. Banks statement that "peripheral neuropathies such as those [described by Plaintiff] can certainly arise from radiation exposure in doses which are excess of 1,000 millirem per hour" was also clarified by Dr. Banks during his deposition. Dr. Banks stated he was not "drawing any conclusion that [Plaintiff] was exposed to an adequate dose" to cause peripheral neuropathy. Id. at 135. Dr. Banks further agreed that his statement left out several critical variables such as the actual exposure rate and the length of the exposure time. Id. at 136. Dr. Banks went on to testify that a person would not contract peripheral neuropathy even if exposed at 1000 millirem per hour for 24 hours. Id. at 137. Defendants further state that Additional Fact #9 is immaterial because Plaintiff's purported presence within an area where there was a high risk of being exposed to dose rates in excess of 1,000 millirem per hour, without expert evidence of the total dose that

5

Plaintiff received in that area, is insufficient proof that he received a dose in excess of federal permissible occupational limits.

**Plaintiff's Additional Fact #10.** Dr. Banks testified that the only way of determining whether a particular disease such as peripheral neuropathy was caused by an agent such as ionizing radiation, would be to do a biopsy of the nerves [sic] determine changes in the nerves to see if they are what one would expect to see from a radiation injury.

**Defendants' Response**: Defendants' agree that Dr. Banks testified as reflected in paragraph #10. Defendants further state that Additional Fact #10 is immaterial to establishing the other necessary element of Plaintiff's claim - that his radiation dose exceeded federal permissible occupational limits.

**Plaintiff's Additional Fact # 11**. Henry Koester recently underwent a nerve biopsy to his lower extremities.

**Defendants' Response:** Immaterial. The results of Plaintiff's nerve biopsy have no probative value in establishing that Plaintiff received a radiation dose in excess of federal permissible occupational limits. Plaintiff has had ample opportunity to have a biopsy completed prior to the March 19, 2007 expert disclosure deadline and certainly prior to the November 30, 2007 close of discovery. For reasons detailed in Defendants' Motion to Strike Evidence of Nerve Biopsy and Defendants' Objection to Plaintiff's Request for Continuance to Reopen Discovery, Plaintiff should not be allowed a "do over" in an effort to avoid summary judgment.

**Plaintiff's Additional Fact #12.** Dr. Fletcher testified that Mr. Koester definitely has polyneuropathy. He believes that a cause of the neuropathy could be due to an ionizing radiation exposure, if indeed it pans out there was an exposure.

**Defendants' Response**: Immaterial. Plaintiff admitted Dr. Fletcher cannot testify as a matter of reasonable medical probability or certainty that Plaintiff's peripheral or polyneuropathy was caused by radiation exposure. See Defendants' SOF 14 and Plaintiff's response thereto. Dr. Fletcher, moreover, does not know the minimum tolerance dose for a radiation induced neuropathy and he has no reason to disagree with Dr. Banks testimony that the minimum

6

tolerance dose would be at least a thousand rem (or 1 million millirem).  See Def. Exhibit 3, page 80, 84.

**Plaintiff's Additional Fact # 13**.  Dr. Fletcher believes there's a strong probability that the plaintiff's polyneuropathy was caused by radiation exposure.

**Defendants' Response**:  Unsupported and Disputed. Dr. Fletcher repeatedly testified that he could not testify as a matter of reasonable medical probability or certainty that Plaintiff's peripheral neuropathy was caused by his radiation exposure.

> Q.  Okay.  If I have understood correctly, you're not testifying as a matter of reasonable medical probability or certainty that his peripheral or polyneuropathy was caused by his radiation exposure.
>
> A.  I can't.

See Defendants' Exhibit 4, page 44.

> Q.  Then on that same document – let's go to Exhibit 3…Down under clinical impression. You say: Mr. Koester has strong objective evidence of lower extremity polyneuropathy…
>
> A.  Yes.
>
> Q.   This is due to his exposure to radiation.  That would not be consistent with your present opinion, right?
>
> A.  Well, I gave that opinion based on the limited knowledge I had as far as his exposure. I think I've testified today that I'm handicapped because I don't have exact dose information to say with any certainty.
>
> Q.  But this would no longer be your opinion, based upon your earlier testimony?
>
> A.  I think there's a strong probability. I can't say with medical certainty.
>
> Q.  Or even scientific or medical probability?
>
> A.  I think there's more probability. I can't say with certainty.

See Defendants' Exhibit 4, page 74-75.

Dr. Fletcher's postulation of a possible causal relationship was based upon his presumption that "radiation in some levels can cause peripheral neuropathy." Id at page 75.  Dr.

7

Fletcher agreed, however, that (1) he did not know Plaintiff's dose, the threshold dose level for peripheral neuropathy from radiation exposure (Id. at page 76), or, the minimum tolerance dose of radiation induced neuropathy for human nerves (Id. at page 84); (2) he did not consider the latency period between Plaintiff's alleged exposure and his symptoms (Id. at page 87), and (3) he did not rule out other causes of Plaintiff's neuropathy. See Defendants' SOF 21-24. Dr. Fletcher also stated that he could not testify that Plaintiff's condition was caused by radiation exposure because: (1) he did not know Plaintiff's dose (See Defendants' Exhibit 4, page 143), (2) he did not know the threshold dose for peripheral neuropathy (Id.), and (3) he could not rule out other causative factors. (Id. at 146-148).

**Plaintiff's Additional Fact #14**. Dr. Banks has not supplemented his opinion after receiving the nerve biopsy report.

**Defendants' Response**: For reasons detailed in Defendants' Objection to Plaintiff's Request for Continuance to Reopen Discovery, Plaintiff's Additional Fact # 14 is immaterial.

**Plaintiffs' Additional Fact #15.** Dr. Fletcher likewise has not supplemented his reports based on nerve biopsy reports.

**Defendants' Response**: For reasons detailed in Defendants' Objection to Plaintiff's Request for Continuance to Reopen Discovery, Plaintiff's Additional Fact # 14 is immaterial.

### B. Defendants' Response To "Additional Facts" Included In Plaintiff's Argument

Plaintiff has included purported "factual" statements within his argument section. Consistent with the local rules, Defendants will identify these "additional facts" and respond hereto.

**Plaintiff's Additional Fact, page 4**. If the Court compares the dosimeter alarm at 66 millirem at chest level with the floor level readings that were as high as 450 one can conclude that the difference in chest height to floor level is a drastic difference.

**Defendants' Response**: Immaterial, Unsupported, and Disputed. Plaintiff's statement grossly misrepresents the comparability of these two readings. The dosimeter worn by Plaintiff

registered a *dose* of 66 millirem on February 10, 2004.  See Defendants' SOF 3.  This is the only record evidence of Plaintiff's *dose* at chest level, or at any other level on February 10, 2004.  The radiation survey taken on February 10, 2004, in contrast, measured a *dose rate* of 450 millirem per hour.  See Pl. Exhibit 1, Vicker's Deposition, page 15-16, 136.  As noted by Dr. Banks, the fact that an area has a particular dose rate tells nothing about a person's dose while in a particular area.  See Defendants' SOF 8.  Information regarding the radiation *dose rate* in an area, by itself, cannot establish a person's dose, and Plaintiff has presented no expert evidence supporting a dose based on this dose rate information.

**Plaintiff's Additional Fact, page 6**.  Dr. Banks has drawn a conclusion that plaintiff was exposed to an adequate amount of radiation to cause peripheral neuropathy.

**Defendants' Response**:  Unsupported and Disputed. Plaintiff's statement is factually unsupported and is directly contrary to Dr. Banks deposition testimony.

Q.  You have no basis that any part of his body received more than 66 millirem?

A.  I have no evidence that any part of his body received more than 66 millirem.

See Defendants' Exhibit 3, page 76.

Q.  I want to say this delicately, but it [Banks statement that neuropathies can certainly arise from radiation exposure in doses which are in excess of 1000 millirem her hour] really doesn't tell us anything. I'm just being fair.

A.  Well, my goal in the sentence was to say that patients who are exposed to doses that can arise from people who are exposed at a rate in excess of 1000 could potentially be high enough to result in peripheral neuropathy.

Q.  I understand that. And I see your purpose. But unless one knows how long they were exposed at that rate—

A.  Indeed, I'm not drawing any conclusion that he was exposed to an adequate dose.

See Defendants' Exhibit 3, page 134-35.

9

**ARGUMENT**

I.  **Summary Judgment Is Warranted Because There Is No Record Evidence That The Plaintiff Received A Dose Of Radiation In Excess Of The Occupational Dose Limits Applicable To This Case**

Summary judgment is warranted when a plaintiff cannot provide expert testimony on an element for which such testimony is required. O'Conner v. Commonwealth Edison Co., 807 F. Supp. 1376, 1401 (C.D. Ill. 1992), aff'd, 13 F.3d 1090 (7th Cir. 1994). Although Plaintiff agrees the requirements set forth in O'Conner apply to this case, he erroneously suggests he can avoid summary judgment, using nearly the same approach by which Mr. O'Conner attempted to show that his dose exceeded permissible limits - i.e., through speculation and without any expert testimony on dose. Id. at 1401-1402. O'Conner makes clear that the Plaintiff has the burden of showing, through expert testimony, that he received a dose that exceeded the NRC permissible dose limits. O'Conner, 807 F. Supp. at 1401 ("dose is a subject requiring expert testimony because it is well beyond the knowledge and expertise of any average person"). Plaintiff admits that neither Dr. Banks nor Dr. Fletcher will testify that his dose on February 10, 2004 exceeded the occupational permissible dose limits. See Defendants' SOF ¶ 5-9 and Plaintiff's response thereto. Summary judgment is warranted for this reason alone.

Because he is not an expert, Plaintiff cannot create a genuine issue of fact on the issue of dose through an affidavit attesting, without corroboration, that he was working in an area where dose rates were likely to be between 100 and 1,000 millirem per hour, and near an area where dose rates could exceed 1,000 millirem per hour. O'Conner, 807 F. Supp. at 1400-1401 (plaintiff's testimony regarding dose was insufficient to avoid summary judgment because, *inter alia*, it was not expert testimony). Defendants note, moreover, that in addition to containing non-expert testimony, Plaintiff's affidavit contains nothing more than speculation about his dose on February 10, 2004. Plaintiff, in particular, makes factually unsupported and conclusory assertions that (1) the "evidence suggests that plaintiff was exposed to radiation in excess of 1,000 millirem", and (2) "since by definition locked high radiation area *could be* an amount in excess of 1,000 millirem per hour then defendant cannot refute that the level of radiation was not

10

only greater than 1,000 millirem per hour but *could be* as high as 50,000 or even a million millirem per hour."

Plaintiff's argument is beyond comprehension and unsupported by any factual statement made in his response. Plaintiff's speculation about the potential *dose rates* in the areas where he was working on February 10, 2004 provide no competent evidence, whatsoever, that Plaintiff's *dose* exceeded 66 millirem for that day. See Defendants' SOF 3. Plaintiff fails to recognize in his argument that information regarding *dose rates* (i.e. 100 millirem per hour), standing alone, provides absolutely no evidence about his *dose* on any particular date.[1] See Defendants' SOF 8.[2] Plaintiff offers no evidence of the radiation *dose* that he received that date. Although he appears to argue he worked in areas designated as a locked high radiation area, he admits in his own affidavit that he worked at all times in an area designated as a "high radiation area" and he speculates – without any factual support – that the area *should have been designated* as a locked high radiation area. See Pl. Exhibit 3, ¶ 7-9. Plaintiff's arguments, moreover, that he *could* have been exposed to radiation levels in excess of 1,000 millirem per hour and that he therefore *could* have had exposures "as high as 50,000 or even a million millirem" is rank speculation and conjecture that cannot be considered to avoid summary judgment. McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004)(inferences supported by only speculation and conjecture will not defeat summary judgment motion); Patterson v. Chicago Association for Retarded Citizens, 150 F.3d 719, 724 (7th Cir. 1998)("self-serving affidavits without factual support in the record will not defeat a motion for summary judgment").

For all of the foregoing reasons, and for reasons detailed in Defendants' Motion for Summary Judgment, judgment in Defendants' favor is warranted because, without expert

---

[1] Plaintiff's reference to the difference between the dose (66 millirem) that he received while working inside the plant on February 10, 2004 and the dose *rate* (450 millirem *per hour*) recorded within one of the areas where he purportedly worked on that date suggests, incorrectly, that there is a direct relationship between these two measurements.

[2] Plaintiff admitted Defendants' Statement of Fact # 8, wherein it was stated that "the fact Plaintiff received a dose rate at some point in time does not tell anything about his actual dose". See Defendants' SOF 8 and Plaintiff's response thereto.

testimony, Plaintiff cannot establish that his dose exceeded 5,000 millirems, or that Defendants violated the duty of care owed.

**IV.     Summary Judgment Is Warranted Because There Is No Record Evidence That The Plaintiff's Exposure To Radiation At The Clinton Power Station Caused His Peripheral Neuropathy**

To establish causation, Plaintiff "must introduce expert testimony to a reasonable degree of medical certainty that his alleged injuries were caused by his radiation exposure." O'Conner, 807 F. Supp. at 1402-03. "[T]o serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a ***reasonable degree of medical certainty*** that proximate cause existed." Wintz by and through Witnz v. Northrop Corp., 110 F.3d 508, 515 (7th Cir. 1997)(emphasis added). Accordingly, where an expert testifies that "he is not stating with any degree of medical certainty" that the defendant's conduct caused the plaintiff's problem, his subsequent equivocal statement of some possible causal relationship is insufficient to raise an issue of fact. Id.

In this case, Dr. Fletcher repeatedly testified that he could not testify to any reasonable degree of medical certainty or probability that Plaintiff suffered from a radiation induced neuropathy. When Dr. Fletcher testified about some possible causal relationship, he subsequently and ultimately agreed he could proffer no causal testimony because he did not know Plaintiff's dose or the minimum threshold dose and he could not rule out other causative factors for Plaintiff's neuropathy. See Defendants' Response to Plaintiff's Additional Fact # 13. Pursuant to Wintz, Dr. Fletcher's testimony is insufficient to raise an issue of fact.

Plaintiff's reliance on Dr. Banks' testimony also cannot withstand scrutiny. In his deposition, Dr. Banks stated that he ***will not*** testify that Plaintiff's peripheral neuropathy was caused by any radiation exposure. See Defendants' SOF 10. Despite Plaintiff's argument to the contrary, Dr. Banks *did not* draw a conclusion that Plaintiff was exposed to an adequate amount of radiation to cause peripheral neuropathy. Dr. Banks, in fact, testified that he was not "drawing any conclusion that [Plaintiff] was exposed to an adequate dose" and he had no evidence that any

part of Plaintiff's body received more than 66 millirem. See Defendants' Response to Additional Fact #7, 9.

Plaintiff's statement that a locked high radiation area "can have levels of radiation greater than 1,000 millirem" is both factually inaccurate and immaterial to the issue of whether he has any expert that will testify to a reasonable degree of medical certainty that a radiation exposure caused his peripheral neuropathy.[3]  Neither Dr. Banks nor Dr. Fletcher testified with a ***reasonable degree of medical certainty*** that proximate cause existed and dismissal is therefore warranted.

Finally, Defendants note that in a last ditch effort to avoid summary judgment, Plaintiff asks this court to re-open discovery so that Dr. Fletcher and Dr. Banks can "supplement their opinions." Plaintiff's request should be disregarded, as an initial matter, because it is embedded within a response to a motion for summary judgment, and is therefore procedurally defective. Aside from this procedural defect, Plaintiff's request should be denied for reasons detailed in Defendants' Objection to Plaintiff's Request For A Continuance To Reopen Discovery.[4] As set forth in that Objection, the Seventh Circuit has consistently recognized that summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007)(quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)). When faced with summary judgment, a plaintiff should not be allowed to request a "do over" so that he can attempt to obtain supplemental expert opinions. Winters v. Fru-Con Inc., 498 F.3d 734, 743 (7th Cir. 2007).

Plaintifff, in short, has provided no competent expert evidence to establish his neuropathy was caused by radiation. Judgment in Defendants' favor is therefore warranted.

---

[3] Although it is true that a locked radiation area is defined as an area where one can receive a *dose rate* of greater than 1,000 millirem per hour, the dose actually received is dependent upon the length of the exposure while in that area and other variables. According to Plaintiff's own affidavit, he was never in an area that was designated as a locked high radiation area.

[4] Defendants have also filed a Motion to Strike Evidence of the Nerve Biopsy because Plaintiff failed to disclose the fact that the nerve biopsy had been completed or the biopsy report to Defendants before the close of discovery.

**CONCLUSION**

Plaintiff cannot establish Defendants breached the duty of care owed, or that they caused his peripheral neuropathy.

WHEREFORE, for these and other reasons detailed above and in Defendants' Motion for Summary Judgment, Defendants respectfully request that the court enter an order dismissing Plaintiff's cause of action.

s/ Tamara K. Hackmann
James C. Kearns
Tamara K. Hackmann
Attorney for Defendant
Heyl, Royster, Voelker & Allen
102 E. Main Street, Suite 300
P.O. Box 129
Urbana, IL 61803-0129
217-344-0060 Phone/217-344-9295 Fax
E-mail: jkearns@hrva.com

Ralph H. Johnson
Attorney for Defendants
Blank Rome LLP
Watergate
600 New Hampshire Avenue, NW
Washington D.C., 20037
202-772-5973 Phone/202-772-1684 Fax
E-mail: JohnsonRH@BlankRome.com

**PROOF OF SERVICE**

      I hereby certify that on December 13, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Nicholas M. Schiro
Tuggle, Schiro & Lichtenberger
P.O. Box 1726
Danville, IL  61834

Mr. John H. Otto
Attorney at Law
Zimmerly, Gadau, Selin & Otto
116 North Chestnut, Suite 200
P.O. Box 3998
Champaign, IL  61826-3998

                                              s/Tamara K. Hackmann
                                              Attorney for Defendants
                                              Heyl, Royster, Voelker & Allen
                                              Suite 300
                                              102 E. Main Street
                                              P.O. Box 129
                                              Urbana, IL 61803-0129
                                              217-344-0060 Phone
                                              217-344-9295 Fax
                                              E-mail: jkearns@hrva.com