E-FILED
Friday, 28 March, 2008  03:47:45 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HENRY KOESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3124 |
| | ) | |
| AMERGEN ENERGY CO., LLC, | ) | |
| and EXELON CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This cause is before the Court on Defendants' Motion for Summary Judgment (d/e 40) (Motion for Summary Judgment).  Defendants also have filed a Motion to Strike Affidavit of Nick Schiro and Statements of Nick Schiro Included in Plaintiff's Response to Motion for Summary Judgment (d/e 46) (Motion to Strike Schiro Affidavit) and a Motion to Strike Evidence of Nerve Biopsy (d/e 47) (Motion to Strike Biopsy).  Additionally, the Newburg-Perini, Stone & Webster Group has filed a Motion to Intervene Under Rule 24 (d/e 49) (Motion to Intervene).  For the reasons stated below, Defendants' Motions are allowed and the Motion to Intervene

is denied.

FACTS

The record reflects that Plaintiff Henry Koester was a journeyman electrician employed by Newburg-Perini, Stone & Webster Group (Newburg-Perini).  In 2004, during a refuel outage, Newburg-Perini contracted with Defendants Amergen Energy Company, LLC and Exelon Corporation to perform certain maintenance tasks at the Clinton Power Station, a nuclear power plant in Clinton, Illinois.  Defendants owned and operated the Clinton Power Station.  Koester worked at this plant.

On February 10, 2004, Koester was working in a steam tunnel at the plant, wearing a radiation detection device called a dosimeter.  A dosimeter measures both its wearer's radiation dose and his dose rate.  A "radiation dose" is the amount of radiation a person's body tissue actually absorbs.  It is measured in millirems.  A "dose rate" is the amount of radiation to which a person is exposed.  It is measured in millirems per hour.  The dosimeter Koester wore on February 10, 2004, included a dose rate alarm set to signal Koester when it detected radiation dose rates in excess of 500 millirems per hour.

Koester was working in an area he asserts was designated "locked high

2

radiation," which means it could expose an individual to more than 1,000 millirems per hour. <u>Response to Defendants' Motion for Summary Judgment (d/e 41)</u>, Undisputed Facts ¶¶ 1, 7. The evidence he offers does not support this assertion, however. Koester cites to his own Affidavit for the proposition that he was working in a locked high radiation area, but his Affidavit actually states that he worked within 12 inches of a locked high radiation area, in a "high radiation area" that should have been designated as a locked high radiation area. <u>See id.</u>, Exhibit 3, <u>Koester Affidavit</u>, ¶¶ 6, 7, 9. A high radiation area is an area in which an individual could be exposed to 100 to 1,000 millirems per hour. <u>Id.</u>, Exhibit 1, <u>Vickers Deposition</u>, at 87. Koester has offered no evidence or explanation of why he believes the area in which he worked should have been designated a locked high radiation area.

On February 10, 2004, Koester's dose rate alarm activated. It recorded a maximum dose rate of 647 millirems per hour. The dosimeter indicated that Koester received a radiation dose that day of 66 millirems. Koester's Clinton Power Station occupational exposure record for 2004 indicates that he received a total radiation dose that year of 115 millirems.

According to one of Koester's experts, Dr. David Fletcher, Koester

reported experiencing significant pain and burning in his feet by the end of February of 2004, less than a month later. Burning and tingling are symptoms of a condition called peripheral neuropathy. Koester was later diagnosed with this condition. Radiation exposure can cause peripheral neuropathy, but so can diabetes, celiac disease, and atherosclerosis. Koester suffers from all three.

No evidence exists regarding whether Koester suffered from peripheral neuropathy before February 10, 2004. Yet, according to another of Koester's experts, Dr. Stephen Banks, when radiation exposure causes peripheral neuropathy, a minimum of three months elapses between the exposure and the first symptoms. More typically, the latency period lasts for a year.

According to Dr. Banks, a person who suffers a one-time acute radiation dose must suffer a minimum dose of about 1 million millirems before peripheral neuropathy can result from exposure. Dr. Banks believes that the 66-millirem radiation dose Koester received on February 10, 2004, is four or five times lower than the natural background radiation dose average Americans receive in a year. The parties do not indicate whether a radiation dose received over time can cause peripheral neuropathy, or, if so,

what threshold level of radiation would be necessary.  Federal regulations,
however, limit annual occupational radiation doses to the whole body to
5,000 millirems.   10 C.F.R. § 20.1201(a)(1)(I).   They limit lifetime
occupational radiation doses to the whole body to 25,000 millirems.  10
C.F.R. § 20.1206(e)(2).

On February 10, 2006, Koester filed the instant Complaint in the
DeWitt County Circuit Court.  See Notice of Removal (d/e 1), Exhibit A,
Complaint.  Defendants removed the case to this Court June 16, 2006.
Notice of Removal.   Koester's Complaint alleges that Defendants were
negligent in failing to: (1) warn Newburg-Perini employees of the radiation
levels in the steam tunnel; (2) maintain proper supervision of Newburg-
Perini employees; (3) inspect the steam tunnel to ensure that it was free of
unsafe levels of radiation; (4) maintain the premises so they were free of
unsafe levels of radiation; (5) adequately train Newburg-Perini employees;
and (6) take other precautions to avoid the risk of exposing Newburg-Perini
employees to high and unsafe radiation levels.  See Notice of Removal,
Exhibit A, Complaint at Count I, ¶ 17 and Count II, ¶ 17.  The Court
deems that it has subject matter jurisdiction based on federal law governing
atomic energy.  See 42 U.S.C. § 2014(w).

5

On November 30, 2007, discovery closed in this case.  Before that date, on August 30, 2007, Koester underwent a nerve biopsy of his left foot and ankle.  See Response to Motion for Summary Judgment (d/e 41), Exhibit 3, Koester Affidavit ¶ 10.  From a nerve biopsy, a doctor can determine whether an individual's peripheral neuropathy may have resulted from radiation exposure.

In his Response to the Motion for Summary Judgment, filed December 3, 2007, Koester included an Affidavit of his attorney Nicholas M. Schiro.  See id., Exhibit 7, Schiro Affidavit.  Schiro avers that he received Koester's biopsy report on October 9, 2007, and asked Dr. Banks for his opinion of the report.  While Dr. Banks had not responded to his request at the time the Response was filed, Dr. Fletcher had "informally advised" Schiro that he believed the biopsy results were consistent with radiation-induced neuropathy.  Id.

Koester never before disclosed this biopsy or its results.  Defendants' September 25, 2006, Requests for Production of Documents included requests for:

> 5.    Any and all medical reports, medical records (including but not limited to x-rays, myelographic and CT scan films), bills, or other writings relating in any manner to the

injuries or illness allegedly sustained by the plaintiff, HENRY KOESTER, as a result of the occurrence in question or subsequent thereto.

38. All documents including, but not limited to, correspondence sent to or received from claimant's medical providers.

39. All medical records concerning the claimant, whether or not alleged to relate to the injury or damages suffered as a result of this incident.

Defendants' Motion to Strike Evidence of Nerve Biopsy (d/e 47), Exhibit 1, Plaintiff's Response to First Set of Request [sic] for Production of Documents by Amergen Company, L.L.C. and Exelon Corporation. Yet, Koester did not disclose the nerve biopsy in response, and he never supplemented his responses. At the time of summary judgment briefing, he had not yet produced the results of the nerve biopsy. In his Response to the Motion for Summary Judgment, however, Koester requests "time to present" affidavits from Dr. Banks and Dr. Fletcher regarding the biopsy and to conduct supplemental depositions. Response to Motion for Summary Judgment, at 4. The Court construes this request as a motion to reopen discovery.[1]

---

[1]The Court notes, however, that Federal Rule of Civil Procedure 56(f) applies here, and Koester has not met its requirements. Rule 56(f) mandates that when a party opposing summary judgment cannot present facts essential to its opposition, it may

On January 10, 2008, Newburg-Perini moved to intervene. Koester filed a worker's compensation claim against Newburg-Perini on October 19, 2004. Koester and Newburg-Perini are currently litigating that claim. Under Illinois law, however, when an employee wins a settlement or judgment against a third party based on an injury for which an employer has paid out worker's compensation, the employer is entitled to reimbursement from the employee. 820 ILCS 305/5(b). While Newburg-Perini has not yet paid Koester any worker's compensation, it argues that this statute grants it an interest in the outcome of this suit.

In June of 2007, the parties in this case apparently were discussing the possibility of settlement. Newburg-Perini asserts that this was the first it learned of the suit. There appears to be a disagreement regarding who informed Newburg-Perini of the suit. Koester has not responded to Newburg-Perini's Motion to Intervene, but from the Motion to Intervene and Defendants' Response, it seems that Newburg-Perini and Defendants agree that in the midst of settlement discussions, Koester's counsel indicated that based on worker's compensation issues, Koester could not settle

---

request a continuance to obtain necessary evidence, but its request must include an affidavit specifying why the evidence is currently unavailable.

without Newburg-Perini's authorization.   Either Koester's counsel or Defendants' counsel then contacted Newburg-Perini, which agreed to a voluntary dismissal of the suit.  At the earliest, this occurred in June of 2007; at the latest, it occurred by July 9, 2007.  <u>Memorandum of Law in Support of Motion to Intervene (d/e 50)</u>, at 2; <u>Response to Motion to Intervene (d/e 51)</u>, Exhibit 1, <u>Affidavit of Tamara Hackman</u>, Attachment C, <u>July 9, 2007 Email</u>.

Koester ultimately failed to dismiss this suit.  Newburg-Perini asserts, however, that no one informed it that the suit continued.  It argues that "[u]pon learning this case was not voluntarily dismissed," it moved to intervene.  <u>Memorandum of Law in Support of Motion to Intervene (d/e 50)</u>, at 2.

<u>ANALYSIS</u>

I.   <u>MOTION TO INTERVENE</u>

The Court first will address Newburg-Perini's Motion to Intervene. Under Federal Rule of Civil Procedure 24(a), regarding intervention by right, the Court must permit intervention by one to whom a federal statute grants an unconditional right to intervene or one who "claims an interest relating to the property or transaction that is subject of the action" and "is

9

so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2).  Newburg-Perini argues that the second scenario applies here.

The Seventh Circuit has held that a party seeking intervention as of right in the absence of a federal statute must show that four criteria are met: (1) timeliness; (2) an interest relating to the subject matter of the main action; (3) at least potential impairment of that interest if the action is resolved without the intervenor; and (4) lack of adequate representation by existing parties. Reid L. v. Ill. State Bd. of Educ., 289 F.3d 1009, 1017 (7th Cir. 2002).  Newburg-Perini has not carried its burden here.

First, Newburg-Perini's Motion to Intervene is not timely.  Whether a motion is timely depends on: (1) the length of time the intervenor knew or should have known of its interest in the case; (2) the prejudice intervention will create for the original parties; (3) the prejudice to the intervenor if its motion is denied; and (4) other unusual circumstances. Id. Courts have found that an intervenor who paid a plaintiff worker's compensation benefits should have known of the plaintiff's subsequent lawsuit at the time of filing. E.g., Schultz v. Connery, 863 F.2d 551, 553 (7th Cir. 1988).  Yet, even under a more forgiving analysis, it is clear here

that Newburg-Perini actually knew of this suit by June or July of 2007, five or six months before it filed its Motion to Intervene.  Moreover, Newburg-Perini's intervention would prejudice at least Defendants significantly.  At a time when the case is otherwise at its conclusion, the parties would be forced to reopen discovery and delay resolution of the suit.  Finally, given Newburg-Perini's ability to bring a separate action against Koester for any worker's compensation it may ultimately pay out and the lack of any unusual circumstances, it seems all factors demonstrate the untimeliness of the Motion to Intervene.

Second, Newburg-Perini cannot show an interest relating to the subject matter of the main action.  Intervention by right is improper where the intervenor's interest is only contingent.  Heyman v. Exch. Nat'l Bank of Chicago, 615 F.2d 1190, 1193 (7th Cir. 1980).  An intervenor whose interest is dependent on a liability determination in another pending action has only a contingent interest.  Chrysler Corp. v. Haden Uniking Corp., 158 F.R.D. 405, 408 (N.D. Ill. 1994).  Koester's worker's compensation claim against Newburg-Perini was still pending at the time Newburg-Perini moved to intervene.  Motion to Intervene, ¶ 7.  Thus, it appears that Newburg-Perini has not yet been found liable to Koester, making its interest here

11

contingent.

Third, given that Newburg-Perini has no direct interest in this action, it cannot establish potential impairment of that interest if the action is resolved without it.  Moreover, even if Newburg-Perini were able to establish an interest here, it could still pursue that interest through other avenues, such as a separate suit against Koester to enforce its lien.  Chubb Group Ins. Co. v. Carrizalez, 375 Ill.App.3d 537, 540, 873 N.E.2d 473, 476 (Ill.App. 1st Dist. 2007).

Fourth, Newburg-Perini's argument that the existing parties will represent its interests inadequately also fails.  Courts presume adequate representation where the intervenor and an existing party have the same goal.  Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs, 101 F.3d 503, 507-08 (7th Cir. 1996).  Here, Newburg-Perini's goal is either: (1) to see Defendants found liable for Koester's injuries, thus offsetting its own potential worker's compensation payout to Koester; or (2) to see the Court find Koester's condition unrelated to his work at the Clinton Power Plant, and thus not grounds for worker's compensation.  In either scenario, one of the existing parties is pursuing the same goal.

Where adequate representation is presumed, the intervenor must

demonstrate some conflict to justify intervention.  Meridian Homes Corp.
v. Nicholas W. Prassas & Co., 683 F.2d 201, 205 (7th Cir. 1982).  Newburg-
Perini raises no claim of conflict between it and Defendants.  It does claim,
however, that Koester has not kept it informed of the progress of this suit
and has, through his own lack of due diligence, damaged its chance to
recover on any future lien.  Yet, allegations of poor legal judgment or less-
than-vigorous pursuit of particular strategies do not establish inadequate
representation.   United States v. Bd. of School Comm'rs of City of
Indianapolis, Ind., 466 F.2d 573, 575 (7th Cir. 1972).  Newburg-Perini has
not complained of anything more substantial.  Clearly Newbury-Perini could
have monitored the progress of this lawsuit itself.  Thus, the Court holds
that Newburg-Perini is not entitled to intervention by right.

Alternatively, Newburg-Perini asserts that it should be allowed
permissive intervention under Federal Rule of Civil Procedure 26(b)(1)(B).
Permissive intervention is available when: (1) the application is timely; (2)
the intervenor shows that it has a claim or defense sharing a common
question of law or fact with the main action; (3) the intervenor shows an
independent basis for jurisdiction; and (4) the Court determines that there
is no undue delay or prejudice to the adjudication of the original parties'

13

rights.  <u>Ligas ex rel. Foster v. Maram</u>, 478 F.3d 771, 775 (7th Cir. 2007);

<u>Sokaogon Chippewa Cmty. v. Babbitt</u>, 214 F.3d 941, 949 (7th Cir. 2000).

The Court agrees that Newburg-Perini has a claim sharing a common

question of fact -- whether Koester's peripheral neuropathy resulted from

radiation exposure at Defendants' plaint.   As noted above, however,

Newburg-Perini's Motion to Intervene was not timely, and intervention now

would delay a case otherwise ready for resolution.  Finally, Newburg-Perini

did not address the jurisdictional issue.  Thus, the Court concludes that

permissive intervention is not appropriate here.

II.   <u>MOTIONS TO STRIKE</u>

On the admissibility of evidence regarding Koester's August 2007,

nerve biopsy, the Court also agrees with Defendants.  Defendants argue that

neither evidence of the biopsy itself nor Attorney Schiro's Affidavit

regarding it are admissible.  Defendants urge the Court to exclude evidence

of the biopsy itself because Koester failed to disclose it during discovery.

Under Federal Rule of Civil Procedure 37(c)(1):

If a party fails to provide information or identify a witness as
required by Rule 26(a) or (e), the party is not allowed to use
that information or witness to supply evidence on a motion, at
a hearing, or at a trial, unless the failure was substantially
justified or is harmless.

Koester has not disputed Defendants' contention that he never disclosed this biopsy before his December 3, 2007, Response to Defendants' Motion for Summary Judgment, and he has offered no explanation for his failure. Thus, the Court has no basis to conclude that Koester's failure to disclose was substantially justified.   Moreover, it clearly was not harmless. Defendants have litigated this case almost to trial without knowledge of a key fact.  Koester now asks to reopen discovery for expert consideration of the biopsy results and supplemental depositions regarding such.  Excusing his failure to disclose would delay resolution of this case substantially and force Defendants to revamp a litigation strategy they developed over the long pretrial period.  The Court will not do so.  All evidence of the nerve biopsy is stricken and excluded, and, for the same reasons, Koester's informal request to reopen discovery on this matter is denied.

This ruling encompasses Attorney Schiro's Affidavit, in which he avers that Dr. Fletcher informally advised him that the nerve biopsy results were consistent with radiation-induced neuropathy.   As Defendants note, however, the Affidavit is also inadmissible hearsay that cannot be used to create a genuine issue of fact at summary judgment.  See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997).  The Court strikes and

excludes Schiro's Affidavit.

III.   <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendants argue that summary judgment in their favor is appropriate because  Koester cannot establish the existence of two elements essential to his case.  The Price-Anderson Act, governing the atomic energy industry, applies here.  <u>See</u> 42 U.S.C. § 2011.  This statute establishes an exclusive federal cause of action, referred to as a "public liability action," covering "any legal liability arising out of or resulting from a nuclear incident."  42 U.S.C. §§ 2014(w), (hh).  Defendants argue that under the statute, Koester cannot show that Defendants violated their duty of care or that radiation caused his peripheral neuropathy.  The Court agrees.

A motion for summary judgment must be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Herman v. Nat'l Broad. Co.</u>, 744 F.2d 604, 607 (7th

Cir. 1984).  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  <u>McKenzie v. Ill. Dept. of Transp.</u>, 92 F.3d 473, 479 (7th Cir. 1996) (quoting <u>Celotex</u>, 477 U.S. at 322).

To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts.  <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586.  Instead, he must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  <u>Id.</u> at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Id.</u>  In determining whether a genuine issue exists, courts should construe "all facts and reasonable inferences from the record in the light most favorable to . . . the non-moving party."  <u>Moser v. Ind. Dept. of Corr.</u>, 406

F.3d 895, 900 (7th Cir. 2005).  Courts, however, are "not required to draw every conceivable inference from the record.  [They] need draw only reasonable ones."  Tyler v. Runyon, 70 F.3d 458, 467 (7th Cir. 1995) (internal quotation marks omitted).

Even viewing all evidence in the light most favorable to Koester, no reasonable trier of fact could conclude that Defendants failed to meet the applicable standard of care.  Under the Price-Anderson Act, "Congress has placed an overlay of federal law upon the rights and remedies previously available under state law."  O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1101 (7th Cir. 1994).  The statute specifies that state law of the state in which an accident occurs should govern substantive decisions, and the Seventh Circuit has concluded that in Illinois, the federal safety regulations set the applicable standard of care in public liability actions.  Id. at 1105.  "[T]he standard of care that a public utility licensee owes to radiation workers . . . is to keep their radiation exposures from exceeding the permissible dose limits that have been established by the federal regulators." O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1376, 1401 (C.D. Ill. 1992), aff'd by O'Conner, 13 F.3d 1090.

The federal safety regulations limit individuals' annual occupational

doses to the more limiting of:

(I)     The total effective dose equivalent being equal to 5 rems
        ([5,000 millirems or] 0.05 Sv); or

(ii)    The sum of the deep-dose equivalent and the committed
        dose equivalent to any individual organ or tissue other
        than the lens of the eye being equal to 50 rems ([50,000
        millirems or] 0.5 Sv).

10 C.F.R. § 20.1201(a)(1).  The regulations also limit lifetime occupational

radiation doses to the whole body to 25,000 millirems.   10 C.F.R. §

20.1206(e)(2).  Because the dose an individual has received "is well beyond

the knowledge and expertise of any average person," a plaintiff must offer

expert testimony on the issue of whether a defendant violated its duty of

care.  O'Conner, 807 F. Supp. at 1401.

Thus, to prove Defendants violated their duty of care, Koester must

present expert testimony that he received an annual occupational radiation

dose above 5,000 millirems or a lifetime dose above 25,000 millirems.  He

has not done so.  Indeed, he has offered no expert testimony regarding his

radiation doses.  The *only* evidence before the Court on dose is Koester's 66-

millirems dosimeter reading on February 10, 2004, and his 2004 Clinton

Power Station occupational exposure record of 115 millirems.  Neither piece

of evidence suffices to establish a genuine issue of fact on whether

Defendants violated their duty of care.

Koester argues that "the court must understand and realize that those levels of exposure are based on record evidence suggesting based on record evidence suggesting [sic] levels at chest level," and asserts that because "floor level readings . . . were as high as 450," the Court should conclude that "actual levels could be off the chart." <u>See</u> <u>Response to Motion for Summary Judgment</u>, at 4. Even ignoring the fact that Koester failed to offer evidence that the 66-millirems reading was a chest-level reading or that any floor readings exist, his argument is still nothing but speculation. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." <u>Steen v. Myers</u>, 486 F.3d 1017, 1022 (7th Cir. 2007). Koester has failed to raise more than a "metaphysical doubt" as to the material facts, and thus summary judgment is appropriate. <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586.

Indeed, even had Koester avoided summary judgment on the duty of care element, he still would fail on causation. "To prove causation, plaintiff must introduce expert testimony to a reasonable degree of medical certainty

that his alleged injuries were caused by his radiation exposure." O'Conner, 807 F.Supp. at 1402-03.  Koester has offered no expert testimony that, to a reasonable degree of medical certainty, radiation exposure caused his peripheral neuropathy.   For the reasons stated above, the Court has excluded evidence of Koester's nerve biopsy.  Koester evidently hopes that, after reviewing the nerve biopsy results, either Dr. Banks or Dr. Fletcher will be able to opine on causation to a reasonable degree of medical certainty. See Response to Motion for Summary Judgment, at 5.  By December 3, 2007, however, nearly two months after Koester's counsel received his nerve biopsy results, Koester still had no formal causation opinion from either doctor.  Koester has not shown that genuine issues of material fact remain.

THEREFORE, Newburg-Perini, Stone & Webster Group's Motion to Intervene Under Rule 24 (d/e 49) is DENIED.  Defendants' Motion for Summary Judgment (d/e 40), Motion to Strike Affidavit of Nick Schiro and Statements of Nick Schiro Included in Plaintiff's Response to Motion for Summary Judgment (d/e 46), and Motion to Strike Evidence of Nerve Biopsy (d/e 47) are ALLOWED.  All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

21

ENTER:   March 28, 2008

      FOR THE COURT:

                          _____ s/  Jeanne E. Scott _____
                                 JEANNE E. SCOTT
                      UNITED STATES DISTRICT JUDGE